# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

HAMMEL J. CLARK,

    Plaintiff,

    v.

SERGEANT STEVEN BEEMAN,
WARDEN RICHARD GRAHAM, JR.,
C.O. II ALICIA CARTWRIGHT,
C.O. II THOMAS CESNICK,
C.O. II MORGAN METZ,
LT. CURRAN MCKENZIE,
SERGEANT WILLIAM SLATE,
HEARING OFFICER DAVID SIPES and
C.O. II WILLIAM LOGSDON,

    Defendants.

Civil Action No. TDC-18-0090

## MEMORANDUM OPINION

    Plaintiff Hammel J. Clark, an inmate at the Western Correctional Institution ("WCI") in

Cumberland, Maryland, has brought this civil rights action pursuant to 42 U.S.C. § 1983 against

Warden Richard Graham, Jr., Lt. Curran McKenzie, Sgt. Steven Beeman, Sgt. William Slate, C.O.

II Alicia Cartwright, C.O. II Morgan Metz, C.O. II William Logsdon, C.O. II Thomas Cesnick,

and Hearing Officer David Sipes. The Clerk shall amend the docket to reflect the correct names

of Defendants. With exception of Hearing Officer David Sipes, who was not served with the

Complaint, Defendants have filed a Motion to Dismiss, or, in the Alternative, for Summary

Judgment. Clark has responded.[1] Having reviewed the Complaint and submitted materials, the

---

[1] Clark is advised that pursuant to Local Rule 105.3, "memoranda in support of a motion or in
opposition thereto and trial briefs shall not exceed thirty-five (35) pages, and reply memoranda

Court finds no hearing necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the

Motion will be granted.

## BACKGROUND

On January 10, 2018, Clark filed this civil rights complaint alleging generally that:

> The prison D.O.C. has established an administration whom has perfected the infectional inducement of systematic suppression for effective remedy for maladministration. The name[d] defendants inflicted unreasonable punishment which turn into cruel mistreatment. I was strip[p]ed of all human dignity. I was faultlessly accused convicted than punished and denied due process. I than had a large barrier placed around the outside of the cell door I was in. These defendants call it a cage.

Compl. at 8-9, ECF No. 1 (alterations to capitalization added). On March 30, 2018, Clark filed a

duplicate of the Complaint. More specifically, the Complaint alleges that Clark was subjected to

a false, retaliatory charge of threatening an officer, was improperly placed in segregation under

unconstitutional conditions of confinement, and was denied due process in the disciplinary

hearing.

## I.    Administrative Segregation

On August 23, 2017, Sgt. Steven Beeman filed a Notice of Infraction against Clark for

violating inmate rules 104 (use of threatening language) and 405 (disrespect, use of vulgar

language). The infraction related to an anonymous, threatening letter sent to Correctional Officer

II Cartwright, the Administrative Remedy Procedure ("ARP") Coordinator at WCI. The

handwriting used in the letter appeared to be that of Clark. As a result of the Notice, on that same

day, Clark was moved into segregation. Compl. at 9. Two correctional officers packed all of

---

shall not exceed twenty (20) pages, exclusive of (a) affidavits and exhibits, (b) tables of contents and citations, and (c) addenda containing statutes, rules, regulations and similar material." D. Md. Local R. 105.3. Clark's filings are in violation of this rule. In the future, briefs that violate these limitations will not be accepted for filing or will be stricken from the record.

Clark's property, inventoried it, gave Clark his allowable property, and placed him in Cell #3-B-9 in segregation.

On August 25, 2017, Clark's classification was changed to administrative segregation pending adjustment ("ASPA"). Although so designated, he was housed within the general population in Housing Unit 3 due to a lack of bed space in WCI's Segregation Unit, Housing Unit 4. The same day, Correctional Officers II Cesnick and Metz were instructed to have Clark pack up his personal property and to move him from Cell #3-B-9 to Cell #3-B-15, in the back of Housing Unit 3. Clark refused to pack his belongings, based on his belief that inmates on ASPA were permitted to keep their property. Clark was then handcuffed and escorted to Cell #3-B-15 without his property, which remained in Cell #3-B-9. Metz and Cesnick then returned to Cell #3-B-9 to inventory and pack Clark's property.

Clark's property included legal documents, personal letters, and medical files. According to Clark, during their inventory, the officers went back and forth to the control booth and handed over some confiscated paperwork. The officers, in fact, confiscated certain items pursuant to OPS (Operational Program Statement) 220.0004, the directive that sets forth allowable inmate personal property, then returned all allowable property to Clark. The officers completed a Notice of Confiscation and Inmate Personal Property Disposition form which listed the confiscated property, including: one piece of paperwork that was forwarded to the Intelligence Unit, one pair of altered eyeglass lenses, two altered plastic mirrors, a plastic bowl, two pillows, and several clothing items. Clark signed a notice consenting to the destruction of all the identified items, except the item forwarded to the Intelligence Unit.

Clark claims that the officers confiscated law books, his Koran and other religious books, medically issued cervical pillows, a medical blanket, his toothbrush, pens, and dishes. The

property inventory sheet, which Clark signed acknowledging that it listed all of his property, shows that Clark had 15 books, three pens or pencils, and a plastic bowl with a cracked lid. On September 8, 2017, a notation was entered on the August 23, 2017 property inventory sheet, stating that on that date the following items were returned to Clark: one cup/bowl, one Koran, one toothbrush, one package of cookies, and one detergent. Although Clark had a 2011 medical note from Jessup Correctional Institution ("JCI") requesting that Clark be permitted to have a cervical pillow for medical reasons, he did not have a valid medical order to have such an item at WCI.

The move to Cell #3-B-15 was conducted in order to accommodate the placement of a barrier to separate ASPA inmates from general population inmates and to prevent contraband or other nonallowable property to be given to Clark. According to Clark, other inmates on "lock up" in Housing Unit 3 did not have a barrier outside their cell doors. Clark Decl. ¶ 8, ECF No. 31-5. The barrier was removed on September 9, 2017. According to Clark, while the barrier was in place, he was not taken for any medical visits, but a nurse brought his medication to him. Clark's Records of Segregation Confinement state that at certain times in August 2017, he refused to participate in out-of-cell activities including showers and medical visits.

## II.    Adjustment Hearing

According to Correctional Officer II Logsdon, on October 18, 2017, he reported to Cell #3-B-15 to escort Clark to his adjustment hearing on the Notice of Infraction, but Clark refused to go. Logsdon advised Clark that the hearing would take place without him, but Clark replied, "I'm not going over there." Logsdon Decl. ¶ 3, ECF No. 26-14. Logsdon advised Sgt. Slate, the Adjustment Coordinator for WCI, that Clark refused to attend the hearing. Slate was responsible for scheduling adjustment hearings and representing WCI during the hearing process. Slate informed Hearing Officer Sipes that Clarke was refusing to attend. Sipes decided to proceed with

the hearing, finding that Clarke had waived his presence. Sipes found that Clark had committed the offenses of using threatening language (rule 104) and using disrespectful language (rule 405) based on the similarities between the handwriting in the threatening letter sent to Cartwright and the handwriting in Clark's ARP grievance dated August 23, 2017. Clark was found guilty of both rule violations and sentenced to 60 days of disciplinary segregation and the loss of 60 days of good conduct credits on the rule 104 violation. No segregation time or loss of credits was imposed for the guilty finding on the rule 405 violation due to Clark's good history.

Clark denies that he was ever informed of the adjustment hearing or that he waived his appearance. In his memorandum in opposition to the Motion ("Opposition"), Clark alleges that Beeman directed Logsdon to pass over him for an adjustment hearing, and that Sipes had a conflict of interest because he was a former correctional officer who had written Clark up for a violation in 2008. According to Clark, he first learned on October 20, 2017 that his adjustment hearing had occurred. At that time, Cesnick advised Clark that the hearing had been held on October 18, 2017 and that he had been found guilty. According to Clark, when he asked Logsdon about the adjustment hearing, Logsdon stated, "They was trying to burn you, and I got you the best deal I could for you . . . you can write it up, I got my back cover." Compl. at 19. Logsdon denies making this statement.

Clark filed appeals of the hearing officer's decision to the Warden and with the Inmate Grievance Office ("IGO"). According to Clark, he never received a response to his appeal to the Warden. When Clark was released from segregation, he saw Slate and Lt. McKenzie, the Manager for Housing Unit 3, in the hearing office room, but neither would come talk with him. Slate and McKenzie do not recall seeing Clark that day and state that they would not have refused to speak to Clark. As of the filing of the Complaint, the IGO had not yet ruled on Clark's appeal.

## III.    ARPs

Clark has filed nine administrative remedy procedure grievances ("ARPs") relating in some way to the events described above.

On August 28, 2017, Clark filed ARP WCI-2049-17 against Cesnick and Metz regarding the cell search of August 25, 2017. The ARP was dismissed pending resubmission because it contained multiple issues. Ultimately, the ARP was dismissed on September 11, 2017, due to Clark's failure to follow the resubmission instructions and because the ARP was deemed repetitive of ARPs WCI-2074-17 and WCI-2073-17. Clark maintains that the dismissal of the ARP was wrong because he is permitted to file related issues in one ARP. On October 27, 2017, Clark filed IGO No. 20171598 as an appeal of the disposition of ARP WCI-2049-17. This appeal was dismissed on May 25, 2018 because Clark had not shown that he had resubmitted the ARP as a single issue, as instructed, such that he had not properly exhausted the ARP process.

On August 31, 2017, Clark filed four ARPs: WCI-2072-17, complaining that he was not being escorted to medical appointments while on segregation; WCI-2073-17, complaining about the barrier around his cell; WCI-2074-17, requesting the return of some of his property; and WCI-2076-17, alleging Cesnick and Metz lied to medical staff. He withdrew each of these ARPs on September 8, 2017.

On September 5, 2017, Clark filed ARP WCI-2105-17, questioning the difference between allowable property while on administrative and disciplinary segregation. The ARP was dismissed on September 6, 2017, pending resubmission, because Clark had not clearly stated an issue and proposed remedy.

On September 6, 2017, Clark filed ARP WCI-2111-17 against Sgt. Daddysman, which was dismissed pending resubmission because he had not clearly identified an alleged violation by

6

Daddysman. The ARP was finally dismissed on September 22, 2017, after Clark failed to resubmit it as directed.

On October 5, 2017, Clark filed ARP WCI-2383-17, complaining that he did not receive copies of correspondence and documents he sent to the Warden. The ARP was dismissed, after investigation, with an explanation of how to request additional copies of previous ARPs and verification that Clark had no pending unanswered request slips or informal complaints.

On October 24, 2017, Clark filed ARP WCI-2676-17, complaining about his October 18, 2017 adjustment hearing. The ARP was dismissed the following day because inmates may not seek relief regarding disciplinary proceeding procedures and decisions through the ARP process. On October 25, 2017, Clark filed IGO No. 20171585 as an appeal of the guilty findings entered at the adjustment hearing. The appeal was dismissed on May 25, 2018, because Clark failed to state a claim upon which administrative relief could or should be granted.

According to WCI records, Clark filed 99 ARPs at WCI from August 18, 2008 to July 23, 2018. According to Cartwright, the ARP Coordinator at WCI, the ARPs received from Clark were either forwarded to the proper investigator or dismissed on procedural grounds. Although Clark asserts that Cartwright, as ARP Coordinator, was involved in his complaints leading to *Clark v. Daddysman*, No. TDC-16-0921, and that she therefore dismissed his more recent ARPs illegally or did not provide responses, Cartwright denies ever dismissing an ARP filed by Clark as retaliation for any lawsuits he has filed.

Generally, Clark alleges that the Notice of Infraction, administrative segregation, confiscation of his property, and disciplinary hearing and finding of guilt violated his due process rights, his right against "excessive punishment," and were in imposed in retaliation for his filing of No. TDC-16-0921. Compl. at 23. He also alleges that the confiscation of his religious and law

7

books violated his First Amendment rights of free exercise of religion and to petition for redress of grievances.

## DISCUSSION

### I. Preliminary Motions

Clark has filed a Motion for Appointment of Counsel. The court may request an attorney to represent any person proceeding *in forma pauperis* who is unable to afford counsel. 28 U.S.C. § 1915(e)(1) (2012). In civil actions, the Court appoints counsel only in exceptional circumstances. *Cook v. Bounds*, 518 F.2d 779, 780 (4th Cir. 1975). In doing so, the Court considers "the type and complexity of the case," whether the plaintiff has a colorable claim, and the plaintiff's ability to prosecute the claim. *See Whisenant v. Yuam*, 739 F.2d 160, 163 (4th Cir. 1984) (citations omitted), *abrogated on other grounds by Mallard v. U.S. Dist. Court for the S. Dist. of Iowa*, 490 U.S. 296 (1989). Exceptional circumstances include a litigant who "is barely able to read or write," *id.* at 162, or clearly "has a colorable claim but lacks the capacity to present it," *Berry v. Gutierrez*, 587 F. Supp. 2d 717, 723 (E.D. Va. 2008); *see also Altevogt v. Kirwan*, No. WDQ-11-1061, 2012 WL 135283, at *2 (D. Md. Jan. 13, 2012). Here, Clark, a frequent litigant in this Court, has demonstrated the ability to articulate and litigate his claims. The Motion will therefore be denied.

Clark has also filed a Motion for Default based on his claim that, as of the date of its filing, he had not received a copy of Defendants' dispositive motion and that Defendants had therefore failed to timely respond to the Complaint. In fact, Defendants had filed a timely response. The Motion for Default is therefore denied.

Clark also filed a "Motion to have Document Ruled as [I]nadmissible Evidence," in which he requests that the Court strike as evidence the threatening letter received by Cartwright with

handwriting purportedly similar to Clark's handwriting. Clark offers no persuasive basis to strike the exhibit. Where the letter was the basis for the Notice of Infraction and adjustment hearing, it is plainly relevant. Although there is no direct evidence that it was written by Clark, a review of the document reveals that there are substantial similarities in the handwriting. To the extent that Clark contends that he did not write the letter, that refutation is best addressed in the context of the dispositive motion, rather than by striking the offered evidence. The Motion is therefore denied.

Clark has also filed a Motion to Amend Evidence, with which he has submitted a supplemental filing to his Opposition. Although the additional filing is not permitted by the relevant briefing rules, in the absence of opposition from Defendants, the Court will grant the Motion and consider the additional facts submitted.

Finally, in another filing, entitled a "Motion for Help," Clark raises complaints of mail tampering based on his concern that the Court did not receive his filings and where he did not receive a copy of the docket sheet for this case. Where the Court has received Clark's numerous filings and will continue to afford sufficient time to Clark in the event of any delays in the mail, the Motion will be denied. Defendants are directed to ensure that legal mail is promptly delivered and that no tampering with the mail be permitted.

## II.     Motion to Dismiss or, in the Alternative Motion for Summary Judgment

In their Motion, Defendants seek dismissal under Federal Rules of Civil Procedure 12(b)(6) or summary judgment under Rule 56. In support of their Motion, Defendants argue that Clark has failed to allege a constitutional or statutory violation that would entitle him to relief under § 1983, some of his claims are unexhausted, there is no vicarious liability under § 1983, Clark's requests for injunctive relief are moot, and Defendants are entitled to qualified immunity.

## A. Legal Standards

To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although courts should construe pleadings of self-represented litigants liberally, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), legal conclusions or conclusory statements do not suffice, *Iqbal*, 556 U.S. at 678. The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005).

Defendants filed their Motion as a Motion to Dismiss or, in the Alternative, for Summary Judgment. Typically, when deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court considers only the complaint and any attached documents "integral to the complaint." *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). Rule 12(d) requires courts to treat such a motion as a motion for summary judgment where matters outside the pleadings are considered and not excluded. Fed. R. Civ. P. 12(d). Before converting a motion to dismiss to one for summary judgment, courts must give the nonmoving party "a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* "Reasonable opportunity" has two requirements: (1) the nonmoving party must have some notice that the court is treating the 12(b)(6) motion as a motion for summary judgment, and (2) the nonmoving party "must be afforded a reasonable opportunity for discovery" to obtain information essential to oppose the motion. *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985) (citation omitted).

Here, the notice requirement has been satisfied by the title of Defendants' Motion. To show that a reasonable opportunity for discovery has not been afforded, the nonmoving party must file an affidavit or declaration under Rule 56(d), or another filing, explaining why "for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). *See Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 245 (4th Cir. 2002). Clark has attached his own exhibits to his Opposition for the Court's consideration. However, he has also filed a "Supplemental Memorandum of More Evidence in Support of Plaintiff's Motion for Summary Judgment" in which he seeks in discovery the video footage of Housing Unit 3's B tier from August 23 to October 22, 2017, the period when he was in segregation. Clark states that the video would show harassment by the correctional officers, including turning the lights on or off and kicking the barrier. He also asks for the video footage from August 25, 2017 that would show Cesnick and Metz walking from his previous cell to the control room with confiscated property and placing the barrier outside his cell. Clark also argues that video from October 18, 2017 would show that Logsdon never came to his door to escort him to the adjustment hearing. For the reasons set forth below, the requested video is not necessary to resolve the Motion. Clark's additional requests for video from October 23, 2017, when an Officer Case allegedly wrote a false infraction against him, and November 27, 2017, when he was allegedly subjected to pepper spray, relate to incidents raised for the first time in the briefing that are therefore not before the Court. *See infra* part II.B. Under these circumstances, the Court will construe Defendants' Motion as a Motion for Summary Judgment for purposes of the arguments requiring consideration of the attached exhibits.

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

**B.    New Allegations**

In his Opposition, Clark attempts to expand his claims. Among other new allegations, Clark asserts that correctional officers have tampered with his mail and written false tickets against him in retaliation for his filing of *Clark v. Daddysman*, No. TDC-16-0921. He alleges discrimination based on race, religion, disability, and his status as a sex offender. Clark further asserts that on November 27, 2017, he was pepper sprayed by correctional officers then charged with an infraction, that he was falsely accused by a female officer of masturbating in the shower, and that there were improprieties in the related disciplinary hearings.

Briefs in opposition to a dispositive motion may not be used to amend a complaint or add new claims. *See Zachair Ltd. v. Driggs,* 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd,* 141 F.3d 1162 (4th Cir. 1998); *Mylan Laboratories, Inc. v. Akzo, N. V.,*770 F. Supp. 1053, 1068 (D. Md. 1991), *aff'd,* 2 F.3d 56 (4th Cir. 1993). The Court therefore will not consider these additional, unrelated allegations.

## C.    Injunctive Relief

Clark seeks his transfer from WCI to JCI.  At this point, however, Clark has in fact been transferred to JCI.  Plaintiff's request for injunctive relief is now moot.  Article III of the Constitution limits the judicial power to "actual, ongoing cases or controversies." *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990) (citations omitted).  A case becomes moot when the issues presented are "no longer 'live' or the parties lack a legally cognizable interest in the outcome." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)).  Under 42 U.S.C. § 1983, an actual controversy must exist at all times while the case is pending.  *See Calderon v. Moore*, 518 U.S. 149, 150 (1996); *Steffel v. Thompson*, 415 U.S. 452, 459 n.10 (1974).  Accordingly, events occurring after the filing of the complaint can render a request for injunctive relief moot.  *See Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) (finding that transfer of the plaintiff to another prison rendered his claims for injunctive relief, but not his claims for damages, moot).  Thus, Clark's transfer to JCI rendered his request for injunctive relief moot.  Because Clark also seeks damages, the Court will consider his remaining claims.  *See id.*

## D.    Administrative Segregation

Construed liberally, Clark alleges that his placement in administrative segregation pending his adjustment hearing violated his right to due process of law under the Fourteenth Amendment to the United States Constitution and his right against cruel and unusual punishment under the Eighth Amendment.  Clark's due process claim fails because assignment to administrative segregation under the conditions in place at the time does not implicate due process rights.  Prisoners have a liberty interest under the Fourteenth Amendment in avoiding confinement conditions that impose "atypical and significant hardship on the inmate in relation to the ordinary

incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995); *see also Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). In *Sandin*, an inmate who was sentenced to 30 days of disciplinary segregation, served that time, then had the disciplinary decision overturned on appeal, filed a due process claim under 42 U.S.C. § 1983. *Id.* at 476. The Court held that the disciplinary segregation, which did not affect the duration of the prison sentence, did not present the type of deprivation that implicates a constitutional liberty interest giving rise to due process rights. *Id.* at 486. Likewise, the United States Court of Appeals for the Fourth Circuit has held that inmates have no liberty interest in avoiding, and thus no due process claim stemming from, placement in administrative segregation. *Beverati v. Smith*, 120 F.3d 500, 502-04 (4th Cir. 1997) (rejecting a due process claim by inmates held in administrative segregation for six months after disciplinary charges were resolved). The court so held even though the actual conditions in segregation were markedly "more burdensome than those imposed on the general prison population," because those conditions were "not so atypical" that they "imposed a significant hardship in relation to the ordinary incidents of prison life." *Id.* at 504 (noting the inmates' claims that segregation included vermin-infested cells, human waste in cells, leaking toilets, unbearable heat, less food, reduced access to clean clothes and linens, reduced out-of-cell time, no outdoor recreation time, and no educational or religious services). Thus, a due process claim relating to placement in administrative or disciplinary segregation can succeed only if the prisoner can show "(1) denial of an 'interest that can arise either from the Constitution itself or from state laws or policies' and that (2) 'this denial imposed on him an atypical and significant hardship . . . in relation to the ordinary incidents of prison life.'" *Prieto v. Clarke*, 780 F.3d 245, 251 (4th Cir. 2015) (quoting *Lovelace v. Lee*, 472 F.3d 174, 202 (4th Cir. 2006)).

"[G]eneral population is the baseline for atypicality for inmates who are sentenced to confinement in the general prison population and have been transferred to security detention while serving their sentence." *Incumaa v. Stirling*, 791 F.3d 517, 527 (4th Cir. 2015). Where conditions in segregated confinement are "similar in most respects to those experienced by inmates in the general population" no liberty interest exists in avoiding that segregation assignment. *Beverati*, 120 F.3d at 503-04. Accordingly, assignment to administrative segregation usually does not create an atypical and significant hardship. *See Hewitt v. Helms*, 459 U.S. 460, 468 (1983) (holding that administrative segregation is part of the ordinary incidents of prison life).

Other than pointing to the limited allowance of property while housed on segregation and the presence of a barrier outside of his cell, Clark has failed to identify how the conditions of his segregation confinement were significantly more onerous than those of general population inmates. The record of his segregation confinement demonstrates that, despite his claims to the contrary, he received medical care and was offered out-of-cell time for showers and recreation. Even if, as he has alleged, he was not taken to certain medical visits, he has identified no specific medical need to see medical personnel during the relevant time period. Nor would the alleged harassment, consisting of minor intrusions such as turning the lights on and off and kicking the barrier, create atypical conditions effecting significant hardship sufficient to implicate due process rights.

Likewise, Clark's movement to Cell #3-B-15, the placement of the barrier outside of his cell door, and the conditions of confinement there did not violate Clark's rights under the Eight Amendment. Conditions of confinement which "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Conditions which are merely "restrictive or even harsh," however, "are part of

the penalty that criminal offenders pay for their offenses against society" and do not necessarily violate the Eighth Amendment. *Id.*

"In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements—that the deprivation of [a] basic human need was *objectively* sufficiently serious, and that *subjectively* the officials acted with a sufficiently culpable state of mind." *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (internal alterations omitted). "These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called 'punishment,' and absent severity, such punishment cannot be called 'cruel and unusual.'" *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008).

"Only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement." *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003). "[T]o withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993).

Defendants moved Clark to a different cell and placed a barrier in front of it to effectuate administrative segregation where there were no available cells in the Segregation Unit. As discussed above, Clark has not articulated any persuasive argument why the presence of the barrier or any other alleged conditions created significant hardship beyond ordinary prison conditions that imposed a physical or emotional injury. Accordingly, the Court will grant the Motion as to any Fourteenth Amendment or Eighth Amendment claims based on Clark's transfer to administrative segregation.

### E. Property Claims

Clark asserts various claims relating to the alleged deprivation of his personal property, including religious and law books and legal papers. Clark's claim that Defendants took property in violation of his due process rights is unavailing. The United States Supreme Court has held that claims of negligent deprivation of property by a prison official do not implicate the Due Process Clause. *See Daniels v. Williams*, 474 U.S. 327, 335-36 (1986). In the case of lost or stolen property, sufficient due process is afforded to a prisoner if there is an adequate post-deprivation remedy process. *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984) ("[W]e hold that an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful post deprivation remedy for the loss is available."); *see also Parratt v. Taylor*, 451 U. S. 527, 540–41 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986). The right to seek damages and injunctive relief in Maryland courts pursuant to the Maryland Tort Claims Act constitutes an adequate post-deprivation remedy. *See Juncker v. Tinney*, 549 F. Supp. 574, 579 (D. Md. 1982). Inmates also have the additional post-deprivation remedy of the ARP process. Thus, any claim that Clark's personal property was taken or destroyed by correctional officers does not state a constitutional claim for relief. *See Hawes v. Foxwell*, No. DKC-17-2598, 2018 WL 2389060 at *4 (D. Md. May 25, 2018) (dismissing an inmate's property loss claim for failure to state a cognizable constitutional claim); *Fuller v. Horning*, No. WMN-11-1917, 2012 WL 2342947, at *7 (D. Md. June 19, 2012) (stating that "removal of property from a prisoner simply does not state a constitutional claim"), *aff'd*, 504 F. App'x 218 (4th Cir. 2013).

Clark's more specific claim that his First Amendment rights were infringed when his legal materials and law books were allegedly confiscated during his cell transfer also fails. Prisoners

have a constitutionally protected right of access to the courts. *See Bounds v. Smith*, 430 U. S. 817, 821 (1977). However, the Supreme Court has stated that:

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

*Lewis v. Casey*, 518 U.S. 343, 355 (1996).

Thus, "a prisoner wishing to establish an unconstitutional burden on his right of access to the courts must show 'actual injury' to 'the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts.'" *O'Dell v. Netherland*, 112 F. 3d 773, 776 (4th Cir. 1997) (quoting Lewis, 518 U.S. at 355). "The requirement that an inmate alleging a violation of *Bounds* must show actual injury derives ultimately from the doctrine of standing." *Lewis*, 518 U.S. at 349. Actual injury occurs when a prisoner demonstrates that a "nonfrivolous" or "arguable" claim was frustrated or impeded because of the denial of access to the courts. *Id.* at 352-53 & n.3. The complaint must contain a sufficient description of the predicate claim to permit an assessment of whether it is "nonfrivolous" or "arguable." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002).

Allegations of injury arising from the denial of access to the courts must be specific and articulate how the litigation was harmed. *See Ali v. District of Columbia*, 278 F.3d 1, 8 (D.C. Cir. 2002) (holding that an allegation that the failure to transport a prisoner's legal documents to his prison caused his unspecified "open case" to be "set back" did not state a claim of actual injury from a denial of access to courts); *see also Johnson v. Hamilton*, 452 F.3d 967, 973-74 (8th Cir. 2006) (dismissing an access-to-courts claim arising from the alleged destruction of the prisoner's

legal papers because there were no allegation of facts supporting a finding of injury or prejudice). *Cody v. Weber*, 256 F.3d 764, 769-70 (8th Cir. 2001) (holding that lack of access to computer disks containing the prisoner's legal materials did not establish a denial of access to courts because the vague allegation that the stored data would "set him free" was insufficient to establish actual injury). Generally, allegations of delay in legal proceedings that do not result in "actual substantial prejudice to specific litigation" are insufficient to state a claim for denial of access to courts. *See Johnson v. Barczak*, 338 F.3d 771, 773 (7th Cir. 2003).

Here, Clark has alleged only that unspecified legal materials or books were improperly confiscated from him during his cell transfer. He has not identified any legal proceedings impacted by such alleged deprivation, as necessary to support an access to courts claim. *Lewis*, 518 U.S. at 355. In short, Clark has alleged neither the required "nonfrivolous" claim frustrated by the alleged deprivation nor any resulting actual injury to state a First Amendment claim relating to confiscated legal materials. *Id.* at 353; *Christopher*, 536 U.S. at 415.

Clark's claims that certain religious materials, including his Koran, were improperly confiscated in violation of his First Amendment rights is likewise flawed. "Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987). However, "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Id.* (quoting *Price v. Johnson*, 334 U.S. 266, 285 (1948)). Prison restrictions that affect inmates' religious exercise but are reasonably related to legitimate penological objectives do not run afoul of the Constitution. *See Turner v. Safley*, 482 U.S. 78, 89-91 (1987). To determine whether a prison regulation is reasonable, and therefore constitutional, courts consider four factors:

(1) whether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right . . . remain open to prison inmates"; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action.

*Wall v. Wade*, 741 F.3d 492, 499 (4th Cir. 2014) (quoting *Lovelace v. Lee*, 472 F.3d 174, 200 (4th Cir. 2006)).

As a threshold matter, to state a claim for violation of rights under the Free Exercise Clause, Clark must demonstrate that: (1) he holds a sincere religious belief; and (2) a prison practice or policy places a substantial burden on his ability to practice his religion. *See Wilcox v. Brown*, 877 F.3d 161, 168 (4th Cir. 2017). A substantial burden is placed upon a prisoner's religious exercise when it "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Id.* Prison restrictions that impact on the free exercise of religion but are related to legitimate penological objectives do not run afoul of the Constitution. *See Turner*, 482 U.S. at 89-91.

Here, the inventory of items confiscated during the cell move on August 25, 2017 includes no religious items or books. Even if a Koran were taken, the inventory records show that a Koran was provided to Clark soon thereafter, on September 8, 2017, and Clark acknowledges that the allegedly confiscated religious materials were returned. Clark has provided no facts establishing that he holds a sincere religious belief and that any such temporary deprivation placed a substantial burden on his ability to practice his religion. The Court will therefore grant the Motion as to this and all other claims relating to the alleged deprivation of property.

## F. Adjustment Hearing

Clark also claims that his right to due process was violated during his adjustment proceeding. In *Wolff v. McDonnell*, 418 U.S. 539 (1974), the Supreme Court held that where an inmate faces the possible loss of diminution or good time credits, the inmate is entitled to certain due process protections, including the right to a hearing at which the inmate may call witnesses and present evidence, so long as doing so is not "unduly hazardous to institutional safety or correctional goals." *Id.* at 563-66; *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 454 (1985). If these procedural protections are provided, due process requires only that "some evidence supports the decision by the prison disciplinary board to revoke good time credits." *Hill*, 472 U.S. at 455. This standard is met if "there was some evidence from which the conclusion of the administrative tribunal could be deduced." *Id.* (quoting *United States ex rel. Vajtauer v. Comm'r of Immigration*, 273 U.S. 103, 106 (1927)). Federal courts do not review the correctness of a disciplinary hearing officer's findings of fact. *See Kelly v. Cooper*, 502 F. Supp. 1371, 1376 (E.D. Va. 1980).

Defendants contend that Clark declined to attend the hearing, while Clark claims that he was never advised of the hearing date, nor was he offered the opportunity to attend. The Court need not address this dispute because, as noted by Defendants, Clark did not exhaust administrative remedies relating to this claim.

Under the Prison Litigation Reform Act of 1995 ("PLRA"), Pub. L. No. 104-134 § 803, 110 Stat. 1321 (1996) (codified as amended at 42 U.S.C. § 1997e(a)):

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a) (2012). Inmates must exhaust administrative remedies before they bring any "suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

Exhaustion is mandatory and generally may not be excused unless the administrative procedure is not available. *See Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016) (holding that an inmate "must exhaust available remedies, but need not exhaust unavailable ones"). "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008). In *Ross*, the Supreme Court identified three circumstances when an administrative remedy is unavailable. An administrative procedure is not available when officers are consistently unwilling or unable to provide relief to aggrieved inmates, the procedure is so opaque that it is practically incapable of use, or prison administrators actively thwart inmates from filing grievances. *Ross*, 136 S. Ct. at 1859-60.

Here, Clark appealed the hearing officer's decision to the IGO on October 25, 2017, one week after the hearing occurred. At the time he filed the Complaint on January 10, 2018, the IGO had not yet ruled on his appeal, such that he had not yet exhausted administrative remedies on this claim. Indeed, Clark acknowledged that he had failed to meet this requirement when he asked that the Court "allow me time to finish exhausting the last stage of 'this' complaint." Compl. at 28. Regardless of whether the administrative process is later completed during the pendency of the case, a plaintiff must have exhausted administrative remedies as of the date of the filing of the original complaint. *See Neal v. Goord*, 267 F.3d 116, 121-22 (2d Cir. 2001) (overruled on other grounds) (holding that inmates must exhaust before filing suit); *Freeman v. Francis*, 196 F.3d

641,645 (6th Cir. 1999) (same); *Perez v. Wis. Dep't of Corr.*, 182 F.3d 532, 534-35 (7th Cir. 1999) (same); *see also Kitchen v. Ickes*, 116 F. Supp. 3d 613, 624 (D. Md. 2015) ("Exhausting administrative remedies after a complaint is filed will not prevent a case from being dismissed for failure to exhaust administrative remedies."). Accordingly, the Court finds that Clark did not exhaust administrative remedies on his claims relating to the adjustment hearing. The Motion will be granted on those claims, which will be dismissed without prejudice.

### G.     Violation of State Policies and Procedures

To the extent that Clark contends that Defendants violated their own written policies in assigning him to segregation, inventorying his property, or in the timing of his adjustment hearing, his claims fail. An alleged violation of Division of Correction policies and procedures ordinarily does not state an independent federal claim. *See Sandin*, 515 U.S. at 481-84 (rejecting the proposition that mandatory prison regulations necessarily created a constitutionally protected liberty interest); *Orellana v. Kyle*, 65 F.3d 29, 31 (5th Cir. 1995) (stating that "prisoners may no longer peruse statutes and prison regulations searching for the grail of limited discretion.").

### H.     Retaliation

Clark asserts that this entire episode was unlawful retaliation for his filing of *Clark v. Daddysman*, No. TDC-16-0921 (D. Md.), in which he alleged constitutional violations by another correctional officer. Clark's retaliation claim is most fairly construed as a claim that he suffered retaliation for exercising his First Amendment right to petition for the redress of grievances. "The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). To state a claim of retaliation for exercising First Amendment rights, a plaintiff must show that (1) the plaintiff engaged in protected First

23

Amendment activity; (2) the defendant took some action that adversely affected the First Amendment rights; and (3) there was a causal relationship between the protected activity and the defendant's conduct. *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005).

While "the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large," "incarceration does not divest prisoners of all constitutional protections." *Shaw v. Murphy*, 532 U.S. 223, 228-29 (2001). "[A] prison inmate retains those First Amendment rights that are not inconsistent with the status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Specifically, the Fourth Circuit has held that an inmate's "right to file a prison grievance free from retaliation" is protected by the First Amendment. *Booker v. S. Carolina Dep't of Corrections*, 855 F.3d 533, 545 (4th Cir. 2017).

In 2016, Clark filed a civil rights complaint against Sgt. Jason Daddysman, Lt. Larry Bennett, Sgt. Thomas Menges, Assistant Warden Denise Gelsinger, Warden Graham, and CO II Cartwright in which he alleged that he was physically and verbally abuse by Daddysman and that he was transferred to a feces-covered cell in retaliation for complaining about the abuse. *Clark v. Daddysman*, No. TDC-16-921, 2018 WL 1453333, at *1 (D. Md. Mar. 22, 2018). The filing of this case constituted protected activity under the First Amendment.

As for the requirement that Defendants took an action adversely affecting Clark's First Amendment rights, Clark asserts that Beeman falsified the threatening letter attributed to Clark, and that his placement in administrative segregation and the disciplinary hearing that resulted in the loss of good time credits constituted retaliatory activity. A plaintiff can establish this element of retaliatory conduct if the defendant took an action that would "deter a person of ordinary

firmness from the exercise of First Amendment rights." *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017) (quoting *Constantine*, 411 F.3d at 500). Although, as discussed above, Clark lacks a general right not to be housed in segregation, the fabrication of evidence and the resulting placement in segregation and imposition of discipline would satisfy this requirement. *See id.* at 250 (finding that placing an inmate in administrative segregation can constitute an adverse action for purposes of a retaliation claim).

However, Clark must also demonstrate a causal connection between his First Amendment activity and the alleged retaliatory action. *See Constantine*, 411 F.3d at 501. This requirement necessitates, at a minimum, a showing that the defendant was aware of the First Amendment activity and that the retaliation took place within some "temporal proximity" of that activity. *Id.* Here, Clark filed his civil rights case on March 28, 2016. He received the infraction which began the sequence of events underlying the present case on August 23, 2017. Other than Warden Graham and Cartwright, named in both cases based on their institutional roles as Warden and ARP Coordinator, there is no overlap among the defendants in the two cases. Significantly, there has been no showing that Beeman, the correctional officer who allegedly initiated the retaliation through the falsification of the threatening letter, or the other Defendants involved in Clark's administrative segregation, alleged loss of property, or disciplinary hearing, were involved in or even aware of the *Daddysman* case. Further, without more, the 17-month period between the two cases reveals a lack of temporal proximity sufficient to support an inference that the present actions were motivated by retaliation. *See id.* (holding that a four-month span between protected activity and retaliatory activity was sufficiently proximate to support a First Amendment retaliation claim).

Finally, a review of the threatening letter reveals that the handwriting is, in fact, similar to that of Clark, who has a distinctive writing style with which the Court has become very familiar.

Where the writing differs only to the extent that it has curves likely indicative of an attempt to disguise, there is an entirely reasonable, nonretaliatory explanation for the Notice of Infraction and subsequent administrative segregation and disciplinary proceedings. Where Clark has not shown that the Defendants engaged in the alleged retaliation were aware of his prior protected activity, he has not established temporal proximity, and the evidence in the record does not support a finding of retaliation, the Court will grant summary judgment on this claim.

### I.    Administrative Remedy Procedure

Clark further alleges that Cartwright and WCI officials improperly failed to process his ARPs and informal grievances, needlessly ordered him to rewrite and resubmit his ARPs, and otherwise mishandled his ARPs. "[I]nmates have no constitutional entitlement or due process interest in access to a grievance procedure." *Booker*, 855 F.3d at 541. Because prisons do not create a liberty interest protected by the Due Process Clause when they adopt administrative mechanisms for hearing and deciding inmate complaints, the failure to abide by those administrative mechanisms does not create a constitutional claim. *See Ewell v. Murray*, 11 F.3d 482, 487-88 (4th Cir. 1993); *Robinson v. Wexford*, No. ELH-17-1467, 2017 WL 4838785, at *3 (D. Md. Oct. 26, 2017) ("[E]ven assuming, *arguendo*, that defendants . . . did not satisfactorily investigate or respond to plaintiff's administrative grievances, no underlying constitutional claim has been stated."); *Ireland v. Morgan*, No. WDQ-10-1943, 2012 WL 503820, at *7 (D. Md. Feb. 14, 2012). Even if correctional staff did not satisfactorily investigate or respond to Clark's ARPs, his claim fails as he has not demonstrated any constitutional injury.

Furthermore, Clark's conclusory allegations that WCI personnel ignored their own procedures when addressing his ARPs are contradicted by the notations on the ARPs themselves, which reflect that dismissals for procedural reasons were grounded in specific cited provisions.

Moreover, it is undisputed that Clark was able to submit 99 ARPs at WCI, that the nine relating to the episodes at issue in this case were resolved, and that Clark was aware of, and on several occasions exercised, his right to appeal to the IGO. Thus, the record does not support the existence of any constitutionally protected injury arising from the ARP process.

### J. Vicarious Liability

Finally, all claims against Warden Graham and Lt. McKenzie must be dismissed because Clark makes no direct allegations against Warden Graham and provides no facts to support any direct liability by McKenzie. To the extent that Clark seeks to hold Warden Graham and McKenzie responsible for the actions of subordinates, the doctrine of *respondeat superior*, or vicarious liability, is not applicable to § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (holding that there is no *respondeat superior* liability under § 1983). Under § 1983, any liability imputed to supervisory officials must be "premised on a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F. 2d 368, 372 (4th Cir. 1984)). Thus, supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to individuals like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F. 3d 791, 799 (4th Cir. 1994). "A single act or isolated incidents are

normally insufficient to establish supervisory inaction upon which to predicate § 1983 liability." *Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983) (footnote and citations omitted).

Here, Clark has failed to plead or demonstrate sufficient facts showing supervisory indifference to, or tacit authorization of, any misconduct by Graham or McKenzie. Decisions by correctional staff considering inmate complaints, without more, does not establish personal participation in the alleged constitutional violation. *See Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) ("[A] denial of a grievance, by itself without any connection to the violation of constitutional rights alleged by plaintiff, does not establish personal participation under § 1983"); *Atkins v. Md. Div. of Correction*, No. PWG-14-3312, 2015 WL 5124103 at *6 (D. Md. Aug. 28, 2015) (finding that a Warden's denial of a grievance alone was insufficient to establish § 1983 liability). In particular, there is no allegation or evidence that these officials were aware of or involved in any alleged retaliation against Clark for filing a prior federal civil rights claim, or in any alleged deprivation of due process arising from the conduct of an adjustment hearing without Clark's presence. Accordingly, all claims against Warden Graham or McKenzie will be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, will be GRANTED. Clark's due process claim against Defendants Logsdon, Slate, and Sipes relating to Clark's adjustment hearing is dismissed without prejudice. All other claims are dismissed with prejudice. A separate Order shall issue.

Date: September 4, 2019

THEODORE D. CHUANG
United States District Judge